Filed 1/2/24  In re Julian V. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re JULIAN V. et al., Persons Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.M., <br><br> Defendant and Appellant. | F086424 <br><br> (Super. Ct. Nos. JVDP-21-000164, JVDP-21-000165, JVDP-21-000166) <br><br> **OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Stanislaus County.  Annette Rees, Judge.

Nicholas Manzanec, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Boze, County Counsel, and Mark Gabriel R. Doronio, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

[*]    Before Levy, Acting P. J., Meehan, J. and DeSantos, J.

Appellant A.M. (mother) is the mother of now five-year-old Julian V., five-year-old Jackson V., and two-year-old Matthew V. (the children), who are the subjects of this dependency case. This is A.M.'s second appeal in this matter. In her first appeal, this court conditionally reversed the juvenile court's order on September 15, 2022, terminating parental rights under Welfare and Institutions Code section 366.26.[1] (*In re J.V. et al.* (Mar. 30, 2023, F085111) [nonpub. opn.] (*J.V. et al.*).) This court accepted the stipulation of the parties that the juvenile court and the Stanislaus County Community Services Agency (agency) failed to comply with the duty to inquire under the Indian Child Welfare Act (ICWA). After remand, the agency made further efforts to inquire of maternal family members. Thereafter, on June 6, 2023, the juvenile court found the agency complied with its duty of inquiry under ICWA, and it concluded ICWA was not applicable.

In the instant appeal, mother appeals from the juvenile court's order on June 6, 2023, finding ICWA was not applicable. Mother contends that the juvenile court erred in finding that ICWA does not apply and that there was sufficient compliance with ICWA. The agency contends that there were no errors in its subsequent efforts to comply with ICWA. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. Facts and Procedural Background Prior to First Appeal[3]

"The agency took the children into protective custody in August 2021 after Matthew was born prematurely and tested positive for methadone, methamphetamine,

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise noted.

[2] The sole issue on appeal concerns ICWA; therefore, we primarily restrict our facts to those bearing on that issue.

[3] The following facts are primarily taken from our previous opinion in this case (*J.V. et al.*, *supra*, F085111).

THC and opiates. Mother was married to Ronnie T. However, her boyfriend, Jonathan V., was named as the father on the twins' birth certificates and he held the children out as his own. He and mother were substance abusers with a significant criminal history, including drug-related charges. The children were placed together in foster care in November 2021.

"On August 13, 2021, Jonathan signed a 'PARENTAL NOTIFICATION OF INDIAN STATUS' (ICWA-020) form, indicating he may have Indian ancestry through his great-grandmother but he could not identify a tribe. An ICWA-020 form signed by social worker Carmen Hernandez was submitted for mother indicating she had no Indian ancestry.[4] Hernandez also completed an ICWA-020 form for Ronnie stating he did not have any Indian heritage.

"The agency filed a dependency petition, alleging the children came within the juvenile court's jurisdiction under section 300, subdivisions (b)(1) (failure to protect) and (j) (abuse of sibling) because of the parents' substance abuse. Ronnie was identified as the presumed father of all three children because of the marital presumption. Jonathan was identified as the presumed father of the twins.

"The presumed fathers appeared at the detention hearing on August 13, 2021. Mother was incarcerated and did not attend the hearing. Jonathan told the juvenile court he possibly had a relative who was a member of a federally recognized tribe but he could not identify a specific tribe. The court directed him to inquire of his relatives. The court ordered Ronnie to undergo paternity testing as to all three children, ordered the children temporarily detained and continued the hearing to August 17, 2021, to give Jonathan time to hire private counsel.

---

**4** "[B]ecause ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

"On August 17, 2021, the juvenile court ordered the children detained and again asked Jonathan if he had any Indian ancestry. He said it was 'unlikely' but had not asked his family. The court found it had no reason to believe ICWA applied, however, ordered Jonathan to make further inquiries. Diane V., Jonathan's mother, reported possible Cherokee ancestry.

"Hernandez gathered information from Jonathan and Diane as well as from the Youth Connections database for purposes of completing the 'NOTICE OF CHILD CUSTODY PROCEEDING FOR INDIAN CHILD' (ICWA-030) form. The Youth Connections database produced a printout, which included the names of 25 maternal relatives, their relationship to the children, birth date, date of death if applicable, age, and address. Twelve of the maternal relatives are deceased, including the maternal grandmother. The agency sent letters to 13 maternal relatives, including the maternal grandfather, a maternal uncle, various 'great' and 'great-great' relatives and several first cousins once removed …." (*J.V. et al.*, *supra*, F085111.)

On September 14, 2021, the agency filed an ICWA-030 form, which it sent to the Cherokee Nation of Oklahoma, the Eastern Band of Cherokee Indians, the United Keetoowah Band of Cherokee Indians and the Bureau of Indian Affairs (BIA) Sacramento Regional Office. The notice included the full names and dates of birth for mother, maternal grandmother, maternal grandfather, maternal great-grandmother, maternal great-grandfather, and eight aunts and uncles. The maternal grandmother's date of birth was noted as 1967 in Sacramento County. The notice indicated "not applicable" in the sections entitled "Tribe or band, and location" and "Tribal membership or enrollment number, if known" for the children's maternal family members.

"On September 28, 2021, the juvenile court convened the jurisdiction and disposition hearing and found Jonathan qualified as the twins' presumed father. The court continued the hearing to October 15, 2021, at which time the court adjudged the children dependents as alleged in the petition, ordered reunification services for mother

4.

and Ronnie as to all three children and for Jonathan as to the twins. Ronnie and Jonathan were ordered to submit to paternity testing, which subsequently established Jonathan's biological paternity and excluded Ronnie. Ronnie was dismissed from the case.

"The BIA Sacramento responded on September 29, 2021, acknowledging the child custody proceedings and the agency's request for assistance in identifying the children's possible tribal affiliation. It also acknowledged that the agency notified the Cherokee tribes based on its inquiry with the family and directed the agency to follow up with the tribes if they did not respond. In letters dated in October and November 2021, the Cherokee Nation, Eastern Band of Cherokee Indians and the United Keetoowah Band of Cherokee Indians informed the agency the children were not Indian children based on the information provided.

"On November 12, 2021, Diane filed a modification petition (§ 388) asking the juvenile court to enforce its order granting her monthly visitation. The court granted the petition at a hearing on December 8, 2021, and found ICWA did not apply.

"In its report for the six-month review hearing, the agency recommended the juvenile court terminate reunification services and set a section 366.26 hearing to consider a permanent plan of adoption. The children were well-loved and cared for by their foster parents and mother and Jonathan were not complying with their court-ordered services. Mother and Jonathan were not drug testing and had felony charges for failure to appear in court, bringing a controlled substance into prison, possession of drugs in prison/jail, grand theft, burglary and possession of a controlled substance.

"On May 19, 2022, at a contested six-month review hearing, the juvenile court found ICWA did not apply, terminated reunification services and set a section 366.26 hearing for September 15, 2022. Neither mother nor Jonathan challenged the setting hearing by extraordinary writ petition.

"In its report for the section 366.26 hearing, the agency recommended the juvenile court terminate parental rights. The agency reported ICWA did not apply, citing the juvenile court's prior finding.

"On September 15, 2022, the juvenile court convened the section 366.26 hearing and found ICWA did not apply. The court set a contested hearing on October 6, 2022. At the contested hearing, the court found the children were likely to be adopted and terminated parental rights." (*J.V. et al.*, *supra*, F085111.)

### B. Facts and Procedural Background After the First Appeal

In mother's first appeal, this court conditionally reversed the juvenile court's order terminating parental rights and remanded the matter back to the juvenile court for the limited purpose of allowing the court and agency to comply with the ICWA inquiry, particularly as to the children's maternal relatives. (*J.V. et al.*, *supra*, F085111.)

On January 30, 2023, the assigned social worker contacted the child's maternal great-grandmother, maternal first cousin once removed, and maternal great-great-aunt, who all denied having Indian ancestry. The social worker also attempted to contact four additional maternal relatives, and voice messages were left without a returned call. The social worker also mailed letters to all the maternal relatives listed in its Youth Connections database. The letters requested the family members respond in order to provide information about any potential Indian ancestry in the family.

The child's maternal great-grandfather returned a phone call and informed the social worker that he did not have Indian ancestry because his family was from Switzerland and Scotland. The maternal great-grandfather had limited information about mother's biological mother (maternal grandmother) because the maternal grandmother was adopted. He believed the biological mother of the maternal grandmother was Italian, and he was unsure of the biological father's ancestry because he was murdered. His wife believed the biological father "might" be Indian, but she was unsure if he was from India

6.

or Native American. The maternal great-grandfather had no identifying information for the biological father of the maternal grandmother.

On February 2, 2023, the maternal grandfather indicated that his wife, the maternal grandmother, was adopted. The maternal grandmother was deceased, and she only met her biological father once. He had no identifying information for the maternal grandmother's father, but he believed that her father was half Native American. The maternal grandfather also claimed that his grandmother (the children's great-great-grandmother) and his great-grandfather (the children's great-great-great-grandfather) were Native American. However, he had no identifying information for them, and he did not know which tribe they belonged to because they died in the 1960's.

The social worker made numerous attempts to obtain information from mother regarding her family's ancestry, however, she refused to provide any information. The agency emailed mother's trial counsel for assistance in gaining mother's cooperation in the inquiry, but he responded, "I don't think I can because it would be to my client's detriment." The agency indicated that it was unable to obtain the names of any tribes and there was no reason to believe the children were Indian children after additional inquiry. The report documenting its additional inquiry of maternal family members recommended that the court find ICWA was not applicable.

On June 6, 2023, the juvenile court held an ICWA compliance hearing. Counsel for the agency submitted on its report and requested the prior orders be reinstated. Mother was not present for the hearing, and her counsel stated, "[y]our Honor, I don't think the [a]gency is in compliance and I would lodge an objection to that extent." Without any further comments or explanation from mother's counsel, the juvenile court found that the agency complied with section 224.2, and it reinstated its previous finding that ICWA was not applicable.

**DISCUSSION**

Mother contends the juvenile court's finding that ICWA did not apply was not supported by substantial evidence because the agency failed to contact the BIA and the State Department of Social Services (DSS) as part of a required further inquiry.

### A.     *Legal Principles*

ICWA reflects a congressional determination to protect Indian children and to promote the stability and security of Indian tribes and families by establishing minimum federal standards that a state court, except in emergencies, must follow before removing an Indian child from his or her family.  (25 U.S.C. § 1902; see *In re Isaiah W.* (2016) 1 Cal.5th 1, 7–8.)  In any "proceeding for the foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe … have a right to intervene" (25 U.S.C. § 1911(c)), and may petition the court to invalidate any foster care placement of an Indian child made in violation of ICWA (25 U.S.C. § 1914; see § 224.2, subd. (e)).  An "Indian child" is defined in ICWA as an unmarried individual under 18 years of age who is either (1) a member of a federally recognized Indian tribe, or (2) is eligible for membership in a federally recognized Indian tribe and is the biological child of a member of a federally recognized tribe.  (25 U.S.C. § 1903(4) & (8); see § 224.1, subd. (a) [adopting federal definitions].)

In every dependency proceeding, the agency and the juvenile court have an "affirmative and continuing duty to inquire whether a child is or may be an Indian child .…"  (Cal. Rules of Court, rule 5.481(a); see also § 224.2, subd. (a); *In re W.B.* (2012) 55 Cal.4th 30, 53; *In re Gabriel G.* (2012) 206 Cal.App.4th 1160, 1165.)  The continuing duty to inquire whether a child is or may be an Indian child "can be divided into three phases:  the initial duty to inquire, the duty of further inquiry, and the duty to provide formal ICWA notice."  (*In re D.F.* (2020) 55 Cal.App.5th 558, 566.)

The initial duty to inquire arises at the referral stage when the reporting party is asked whether it has "any information that the child may be an Indian child."  (§ 224.2,

subd. (a).)  Once a child is received into temporary custody, the initial duty to inquire includes asking the child, parents, legal guardian, extended family members, and others who have an interest in the child whether the child is, or may be, an Indian child. (§§ 224.2, subd. (b), 306, subd. (b).)  The juvenile court has a duty at the first appearance of each parent to ask whether he or she "knows or has reason to know that the child is an Indian child."  (§ 224.2, subd. (c).)  The court must also require each parent to complete form ICWA-020.  (Cal. Rules of Court, rule 5.481(a)(2)(C).)

Next, a duty of further inquiry arises when the agency or the juvenile court has "reason to believe" the proceedings involve an Indian child but "does not have sufficient information to determine that there is reason to know that the child is an Indian child .…" (§ 224.2, subd. (e).)  As recently clarified by the Legislature, a "reason to believe" exists when the juvenile court or agency "has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe." (*Id.*, subd. (e)(1).)

If there is a reason to believe an Indian child is involved, the juvenile court or the agency "shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable."  (§ 224.2, subd. (e).)  Further inquiry includes, but is not limited to, "[i]nterviewing the parents, Indian custodian, and extended family members," and contacting the BIA, the DSS, and the tribes and any other person who may have information.  (§ 224.2, subd. (e)(2)(A)–(C).)

The final duty component arises when the court or agency has "reason to know" the child is an Indian child.  (*In re D.F.*, *supra*, 55 Cal.App.5th at p. 567.)  A " reason to know" exists if one of the following circumstances is present:  "(1) A person having an interest in the child … informs the court that the child is an Indian child[;] [¶] (2) The residence … of the child [or] the child's parents … is on a reservation or in an Alaska Native village[;] [¶] (3) Any participant in the proceeding … informs the court that it has discovered information indicating that the child is an Indian child[;] [¶] (4) The child …

9.

gives the court reason to know that the child is an Indian child[;] [¶] (5) The court is informed that the child is or has been a ward of a tribal court[;] [or] [¶] (6) The court is informed that either parent or the child possess[es] an identification card indicating membership or citizenship in an Indian tribe."  (§ 224.2, subd. (d)(1)−(6).)

If the juvenile court makes a finding that proper and adequate further inquiry and due diligence have been conducted and there is no reason to know whether the child is an Indian child, the court may make a finding that ICWA does not apply, subject to reversal if the court subsequently receives information providing reason to believe the child is an Indian child.  If the court receives such information, it must direct the social worker or probation officer to conduct further inquiry.  (§ 224.2, subd. (i)(2).)

### B.    Standard of Review

"The juvenile court's finding that ICWA does not apply to the proceeding rests on two elemental determinations, 'subject to reversal based on sufficiency of the evidence.' "  (*In re K.H.* (2022) 84 Cal.App.5th 566, 601 (*K.H.*), quoting § 224.2, subd. (i)(2).)  First, "[t]he court must find there is 'no reason to know whether the child is an Indian child,' which is dependent upon whether any of the six circumstances set forth in subdivision (d) of section 224.2 apply."  (*K.H.*, at p. 601, quoting § 224.2, subd. (i)(2).)  Second, "[t]he juvenile court must … find a 'proper and adequate further inquiry and due diligence .…' "  (*K.H.*, at p. 601, quoting § 224.2, subd. (i)(2).)

Under the substantial evidence standard, " 'a reviewing court should "not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts." [Citation.]  The determinations should "be upheld if … supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." ' [Citations.]  The standard recognizes that '[t]rial courts "generally are in a better position to evaluate and weigh the evidence" than appellate courts' [citation], and 'an appellate court should accept a trial court's factual findings if they are reasonable and supported by substantial

evidence in the record' [citation]. '[I]f a court holds an evidentiary hearing, it may make credibility determinations, to which an appellate court would generally defer.' " (*K.H.*, *supra*, 84 Cal.App.5th at p. 601.)

The juvenile court's finding on the second element, however, "is ultimately discretionary because it requires the juvenile court to 'engage in a delicate balancing of' various factors in assessing whether the agency's inquiry was proper and adequate within the context of ICWA and California law, and whether the agency acted with due diligence." (*K.H.*, *supra*, 84 Cal.App.5th at p. 601, quoting *In re Caden C.* (2021) 11 Cal.5th 614, 640.) Therefore, we employ a hybrid standard and review the court's determination for substantial evidence and abuse of discretion. (*K.H.*, at p. 601.)

" 'Review for abuse of discretion is subtly different [from review for substantial evidence], focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when " ' "the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination." ' " [Citation.] But " ' "[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court[.]" ' " [Citations.] [¶] While each standard here fits a distinct type of determination under review, the practical difference between the standards is not likely to be very pronounced.' " (*K.H.*, *supra*, 84 Cal.App.5th at p. 602.)

"Review of the juvenile court's findings under the foregoing standards is deferential, but ' "an appellate court [nevertheless] exercises its independent judgment to determine whether the facts satisfy the rule of law." ' [Citations.] Where the material facts are undisputed, courts have applied independent review to determine whether ICWA's requirements were satisfied." (*K.H.*, *supra*, 84 Cal.App.5th at p. 602.)

### C.    Analysis

First, we note that both mother and her trial counsel's failure to participate in the ongoing ICWA inquiry and identify any ICWA errors on remand could be considered in

evaluating whether a juvenile court abused its discretion.  (See *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1013 ["[I]f counsel do not identify any ICWA errors below, that fact should be a relevant consideration in evaluating whether a juvenile court abused its discretion in finding that an ICWA inquiry was sufficient."].)  "Counsel should not forget that they are officers of the court, and while it is their duty to protect and defend the interests of their clients, the obligation is equally imperative to aid the court in avoiding error and in determining the cause in accordance with justice and the established rules of practice." (*Furlong v. White* (1921) 51 Cal.App. 265, 271.)

"At some point, there must be finality to the ICWA [inquiry] process."  (*In re Z.W.* (2011) 194 Cal.App.4th 54, 67.)  Allowing parents to raise inquiry issues on second appeal after failing to raise those issues in the juvenile court at the post-remand compliance hearing would further prolong the proceedings to the detriment of the child. (*In re Amber F.* (2007) 150 Cal.App.4th 1152, 1156; *In re X.V.* (2005) 132 Cal.App.4th 794, 804 ["We do not believe Congress anticipated or intended to require successive or serial appeals challenging ICWA notices for the first time on appeal."].)  Mother has provided no reason that she should be exempted from the requirement that she raise her specific inquiry concerns in the juvenile court before making such challenges in a successive appeal.  However, even if we were to excuse mother's failure to raise the issue on remand, we affirm the order since further inquiry was not required.

In the present case, the children's father indicated he may have Indian ancestry through his great-grandmother, and the paternal grandmother identified Cherokee as the possible tribe.  Mother denied that she had any Indian ancestry.  The agency sent notice with the paternal and maternal family's information to the Cherokee tribes and the BIA. None of the Cherokee tribes indicated the children were either enrolled or eligible for enrollment in the tribes.  The BIA acknowledged receipt of the notice and the agency's request for assistance in identifying possible tribal affiliation.

Upon remand, the maternal grandfather disclosed unknown ancestry for the children through their maternal grandmother and his grandmother (the children's great-great-grandmother). However, the maternal grandfather was unable to provide any identifying information for any of the family members. There were also no tribal names, geographic areas, or other information that would be helpful in determining the identity of a tribe for those family members. The juvenile court reinstated its previous ICWA finding after determining the agency complied with section 224.2.

Mother argues that the maternal grandfather's disclosure of possible ancestry for the children through unknown tribes required the agency to contact the BIA and the DSS to assist in "identifying the names and contact information of the tribes in which the child[ren] may be a member, or eligible for membership in." (§ 224.2, subd. (e)(2)(B).)

The inquiry required by section 224.2, subdivision (e)(2) is a sequential three-step process. First, the agency must interview the parents, Indian custodian, if any, and extended family members to gather relevant information. (§ 224.2, subd. (e)(2)(A).) Only if this information provides something useful in determining whether the child may be an Indian child or may lead to additional information being uncovered by the BIA or the DSS, must the agency take the next step of contacting the BIA and the DSS to see what additional information they can provide. (§ 224.2, subd. (e)(2)(B); *In re J.S.* (2021) 62 Cal.App.5th 678, 689 (*J.S.*).) The third step requires the agency to contact tribes that may reasonably be expected to have information regarding the child's membership to obtain additional information. (§ 224.2, subd. (e)(2)(C).)

To contact the relevant tribes, the agency must have the name or at least a hint of the name of those tribes from some source, which would generally be from the inquiry it completed in steps one and two. In order to require the agency to contact the BIA or the DSS, the agency must have some information that the BIA or the DSS could use to provide them with information to identify tribes.

The instant case is similar to *J.S.*, *supra*, 62 Cal.App.5th 678. There, the father indicated he may have Indian ancestry and the mother reported she was nearly 100 percent certain none of her relatives had been eligible or enrolled in any tribe. (*Id*. at p. 689.) She did, however, receive "results from ancestry.com [claiming] 'she had approximately 54 [percent] Native American lineage/heritage.' " (*Ibid*.) In rejecting the claim the [agency] failed to conduct a proper inquiry, the court noted, "[w]ithout the identity of a tribe, let alone a federally recognized one, or at least a specific geographic area of possible ancestry origin, the [BIA] could not have assisted the [agency] in identifying the tribal agent for any relevant federally recognized tribes." (*Ibid*.) As a result, the court concluded, "[t]ransmission of a notice to the BIA would have been an idle act. (Civ. Code[,] § 3532 ['[t]he law neither does nor requires idle acts'].) Without more information, the [agency] also could not send notices to any tribes." (*Id*. at p. 690, fn. omitted.) The court concluded the department conducted an adequate and proper further inquiry under section 224.2, subdivision (e). (*J.S.*, at p. 689.)

Both mother and the maternal grandfather were unable to provide any identifying information for either the maternal grandmother's father or the maternal great-great-grandmother, the tribe or tribes with which they may have been affiliated, or any available relatives who may have additional information. Further inquiry requires contacting only those tribes "that may reasonably be expected to have information regarding the child's membership status or eligibility." (§ 224.2, subd. (e)(2)(B).) However, there are no such tribes in this case. "Without the identity of a tribe … or at least a specific geographic area of possible ancestry origin, the [BIA and the DSS] could not have assisted the [agency] in identifying the tribal agent for any … relevant tribes. (*J.S.*, *supra*, 62 Cal.App.5th at p. 689.)

In addition, the BIA was already contacted by the agency through the formal notice sent in September 2021, and the BIA acknowledged receipt of the notice. There was no need for updated information to be provided to the BIA because there were still

14.

no tribal names or membership numbers that were available for the maternal family members.  Resubmitting the maternal family member's same information to the BIA with the hopes that it would uncover a tribal identity would have been "an idle act."  (*J.S.*, *supra*, 62 Cal.App.5th at p. 690.)

Next, mother's argument that the BIA could have reviewed the maternal grandmother's adoption records is misplaced because she was born prior to the passage of ICWA in 1978.  (25 U.S.C. § 1901 et seq.)  Thus, there was likely no requirement that records of adoption involving Indian children be provided to the Secretary of the Interior through the BIA at the time of her adoption.  (25 U.S.C. § 1951(a).)  Furthermore, the agency would also be unable to obtain information to uncover the identity of the biological father of the maternal grandmother from either the BIA or the DSS because it is not authorized to do so.  (See Fam. Code, §§ 9200–9201 & 8611 [confidentiality of adoption records generally]; See also *In re C.Y.* (2012) 208 Cal.App.4th 34, 40–42 [agency not required to investigate mother's adoption records and determine to what Indian tribe she was affiliated; if additional information about mother's tribal affiliation was contained and still available in adoption records, it was mother's responsibility to make an application to the appropriate county requesting such information and then provide it to the social worker].)

In sum, contact with the BIA and the DSS under these circumstances would be fruitless, so it would be unreasonable to interpret section 224.2 as requiring the agency to do so.  The only tribes the agency had reason to believe the children may be associated with are the three federally recognized Cherokee tribes, and the agency successfully contacted them.  The agency had no reason to contact the BIA or the DSS "for assistance in identifying the names and contact information of the tribes in which the [children] may be a member."  (§ 224.2, subd. (e)(2)(B).)  There was no family or tribal information on the basis of which the agency could have conducted any meaningful further inquiry, and

15.

there was no available family member identified as having such information.  For all of these reasons, we conclude there was no violation of the duty of further inquiry.

## DISPOSITION

The order is affirmed.